**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.,
Fla. Bar No. 0182877
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| YANATHA DESOUVRE, on behalf of his minor children, J.D. and A.D., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DISNEY WORLDWIDE SERVICES, INC., a corporation, and DISNEY ENTERTAINMENT OPERATIONS LLC, a limited liability company,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Minor Plaintiffs J.D. and A.D. ("Minor Plaintiffs"), by and through their guardian, Yanatha Desouvre ("Plaintiff"), and undersigned counsel, allege the following, individually and on behalf of all similarly situated persons, against Defendants Disney Worldwide Services, Inc. and Disney Entertainment Operations LLC (collectively, "Disney" or "Defendants"). Plaintiffs base the following

allegations upon information and belief, investigation of counsel, and their own personal knowledge.

## I.  NATURE OF THE ACTION

1.      Plaintiff Yanatha Desouvre brings this class action on behalf of his minor children, J.D. and A.D., individually and on behalf of all other individuals who had their privacy invaded by Disney's intrusive and unlawful business practices of enabling the collection of personal information from millions of children under the age of 13 in the United States, without providing notice to parents or obtaining verifiable parental consent.

2.      Disney is a worldwide media conglomerate that produces and distributes highly popular child-directed content, including through its official channels on YouTube, a video- sharing platform owned by Google LLC ("Google"). Since 2019, Disney has failed to designate its animated videos, cartoons, movie clips, and other content clearly aimed at children under 13 as "made for kids" on YouTube.

3.      Disney's failure to designate its videos as "made for kids" has allowed the collection of personal data from children, including persistent identifiers (like cookies and device IDs) and sensitive information (such as identity and location), all without notifying parents or securing verifiable parental consent.

4.      Disney thereby generates substantial advertising revenue from

opening up its audience of millions of children under the age of 13 to YouTube's targeted advertising algorithm.

5.      Disney's conduct illegally invades the privacy of millions of children in the United States, and it violates an array of federal and state statutes protecting children and consumers.

6.      Minor Plaintiffs bring claims on behalf of themselves and all other similarly situated children under the age of 13 injured by Disney's misconduct.

## II. PARTIES

8.      Minor Plaintiffs J.D. and A.D. and their guardian Yanatha Desouvre are American citizens and residents of Florida. On multiple dates between 2019 and the present, Minor Plaintiffs watched child-directed content uploaded by Disney on the YouTube platform. Upon information and belief, Minor Plaintiffs viewed videos that Disney did not designate as "made for kids" over several years. As a result, Minor Plaintiffs' data was collected and exploited for targeted behavioral advertising. Minor Plaintiffs' guardian was never notified that Disney had enabled the collection of his children's personal information for the purpose of targeted behavioral advertising. Minor Plaintiffs' guardian never provided consent of any kind for his children's information to be collected and used for targeted behavioral advertising on the YouTube platform. Minor Plaintiffs' guardian significantly values his children's privacy and would not have consented to the collection of his

children's data on Disney's channels. Minor Plaintiffs' guardian would not have permitted his children to access YouTube had he known that Disney was not abiding with internet laws designed to protect children.

9.      Defendant Disney Worldwide Services, Inc. ("Disney Worldwide") is a Florida corporation with its principal place of business at 1375 Buena Vista Drive, Lake Buena Vista, Florida 32830, and which maintains corporate offices in New York at 7 Hudson Square, New York, New York 10013.

10.     Defendant Disney Entertainment Operations, LLC ("Disney Entertainment") is a Florida limited liability company, with its principal place of business at 500 Buena Vista Street, Burbank, California 91521, and which maintains corporate offices in New York at 7 Hudson Square, New York, New York 10013. Disney Entertainment is primarily responsible for the creation, distribution, and monetization of Disney's entertainment content, including video programming made available on platforms such as YouTube.

## III.    JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as well as pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because at least one member of the Class, as defined below, are citizens of a different state than Defendants, thereby fulfilling the requirement of minimal diversity, there are more than 100 members of the Class, and the aggregate amount in controversy

exceeds $5,000,000 exclusive of interests and costs.

12.    This Court has general personal jurisdiction over Defendants because Disney Worldwide and Disney Entertainments are citizens of the State of Florida.

13.    This Court has specific personal jurisdiction over Defendants because Defendants transact business in Florida and Plaintiff's claims arise out of Defendants' Florida activities.

14.    This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because at least one Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District; and Defendants conduct substantial business within this District.

## IV.    FACTUAL BACKGROUND

15.    The Walt Disney Company operates as one of the world's largest media and entertainment conglomerates through numerous subsidiaries, including Disney Worldwide and Disney Entertainment.

16.    Disney has built a media empire based on content that is specifically made for children, including the use of globally recognized characters, franchises, and branded content including Disney Princesses, Pixar, Marvel, and Star Wars.

17.    Disney's business model depends on capturing and monetizing children's attention across multiple platforms, including television, streaming,

merchandise, theme parks, and digital media.

18.     Central to this strategy is engaging, child-directed content designed to attract and retain young viewers, often without meaningful parental oversight, which allows Disney to generate billions in revenue annually through advertising, licensing, and data-driven marketing.

**A.     The YouTube Platform**

19.     As part of Disney's media strategy, Disney maintains a direct and lucrative commercial relationship with YouTube, an online video-sharing platform and subsidiary of Google, where users can view videos or upload video content.

20.     YouTube videos are viewable by anyone who accesses YouTube by visiting www.youtube.com or using the YouTube mobile or streaming device app. YouTube does not require individuals to register or sign into its site to watch videos.

21.     YouTube requires that videos intended to be available to the public be uploaded through a channel.

22.     Each channel has a unique account and serves as a personalized space where a particular content creator's videos, playlists, branding, and audience engagement tools are hosted.

23.     Content creators like Disney have full control over the videos it uploads to its channels, including the ability to set titles, thumbnails, descriptions, age designations, and monetization preferences.

24.     Users may find videos on YouTube by navigating to a particular channel's homepage, or users may come across videos uploaded to a particular channel without interacting directly with that channel.

**B.      YouTube's Data Collection and Ad-Targeting Practices**

25.     YouTube operates on an advertising-supported model. Ads displayed before, during, and alongside YouTube videos generate the vast majority of revenue for YouTube and its content creators.

26.     Content creators who upload videos on YouTube, like Disney, also financially benefit from this advertising revenue through the YouTube Partner Program, a monetization agreement that allows eligible content creators to receive a significant share of advertising revenue generated from videos of their content on YouTube, including pre-roll, mid-roll, banner, and targeted display advertisements.

27.     Advertising on YouTube can target users using either contextual or behavioral targeting.

28.     Contextual targeting is the delivery of advertisements to individuals based on the type of content that the user is consuming, as opposed to the specific viewer who is watching it. For example, an advertiser might promote cookware on a recipe blog.

29.     Behavioral targeting is the delivery of advertisements to individuals based on that user's viewing history and personal information, which YouTube can

track across multiple websites, apps, and devices. YouTube and content creators like Disney prefer behavioral advertising because it is generally regarded as more effective, and thus more lucrative, than contextual targeting.

30.    To facilitate behavioral targeting, YouTube collects personal information from individuals who access YouTube. That personal information includes a person's YouTube viewing history, user activity (searches run, views and interactions with content and ads, *etc.*), location information (GPS, internet protocol ("IP") address, device sensor data, and data from devices located near a user), and unique identifiers (cookie IDs, advertising IDs, device IDs, and others). That data is collected and stitched into a profile of a user which gives YouTube (and whoever YouTube shares that information with, including advertisers) the most accurate, up-to-date snapshot of a user's preferences, interests, attributes, and behaviors.

31.    The information YouTube collects is incorporated into an algorithm which infers which types of advertisements are likely to have the greatest impact on the user associated with the information (*i.e.*, are most likely to be clicked on).

32.    Advertisers pay YouTube more to run behavioral advertising, and YouTube in turn pays content creators, including Disney, more for running behavioral advertising on a channel than YouTube would have paid a creator like Disney for only allowing contextual advertising.

33.    YouTube's collection of viewing history and personal information

from users, and identification of preferences inferred from their profiles, is therefore essential to earn more advertising revenue.

### C.    Disney's Presence on YouTube

34.    Disney operates various official channels on YouTube, including Disney Channel, Disney Junior, Disney Kids, Disney Animation Studios, Disney Parks, Pixar, and many franchise- specific channels.

35.    Disney has uploaded tens of thousands of videos for consumers to view on YouTube, and many of those videos are extremely popular. According to a Federal Trade Commission complaint filed against Disney, videos on just three dozen of Disney's channels resulted in tens of millions of hours watched worldwide and hundreds of millions of views in the United States in just three months of 2019. During three months of the early COVID-19 pandemic period of 2020, viewing time soared to over 100 million hours worldwide, with approximately 1.2 billion views in the United States alone.[1]

36.    Children are easily able to find and view Disney content on YouTube through YouTube's search function, autoplay suggestions, and algorithmically driven recommendations, which promote similar or related content.

---

[1] Complaint for Permanent Injunction, Civil Penalty Judgment, and Other Relief, *United States v. Disney Worldwide Servs.*, No. 2:23-cv-8223 (C.D. Cal. Sep. 2, 2025), Dkt. No. 1, *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/DisneyComplaint.pdf.

Young children frequently access this content directly through the search feature, or indirectly through embedded videos available on the YouTube app and other media.

37. During the period from 2019 through the present ("Class Period"), Disney operated and uploaded videos to more than 1,250 YouTube channels.

38. Disney's presence on the YouTube platform allows it to generate substantial revenue from targeted advertising and collect significant personal information from its users through the YouTube Partner Program.

39. As a partner with YouTube, Disney also has access to YouTube's content management, audience analytics, and monetization tools including settings related to behavioral advertising and indicating whether content is directed at children under the age of 13.

40. These tools allow Disney to benefit from and indirectly access personal data, especially viewing history and other behavioral data, that YouTube collects from viewers, including children.

41. Indeed, given the lucrative value of behavioral advertising revenue, as noted above, Disney has a strong financial incentive to allow YouTube to collect viewing history data and personal information from users, including children under the age of 13, in order to develop detailed profiles about these users, facilitate behavioral advertising on its videos, and reap greater profits from its YouTube presence.

**D.      The Children's Online Privacy Protection Act ("COPPA")**

42.      In order to prevent this type of invasive collection of children's personal information, Congress passed the Children's Online Privacy Protection Act ("COPPA") in 1998 to prohibit the unauthorized or unnecessary collection of children's personal information online by operators of Internet websites and online services. COPPA directed the Federal Trade Commission (the "FTC") to promulgate a rule implementing COPPA. The FTC promulgated the COPPA Rule on November 3, 1999, under Section 1303(b) of COPPA, 15 U.S.C. § 6502(b), and Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553. The Rule went into effect on April 21, 2000. The FTC promulgated revisions to the Rule that went into effect on July 1, 2013. Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

43.      The COPPA Rule applies to any operator of a commercial website or online service directed to children that collects, uses, and/or discloses personal information from children, and to any operator of a commercial website or online service that has actual knowledge that it collects, uses, and/or discloses personal information from children. The Rule requires an operator to meet specific

requirements prior to collecting online, using, or disclosing personal information from children, including but not limited to:

    a. Providing clear, understandable, and complete notice of its information practices, including specific disclosures, directly to parents (Section 312.4(b) of the Rule, 16 C.F.R. § 312.4(b));

    b. Posting a prominent and clearly labeled link to an online notice of its information practices with regard to children, including what information the

    website operator collects from children online, how it uses such information, its disclosure practices for such information, and other specific disclosures set forth in the Rule (Section 312.4(d) of the Rule, 16 C.F.R. § 312.4(d)); and

    c. Obtaining verifiable parental consent prior to collecting, using, and/or disclosing personal information from children (Section 312.5(a)(1) of the Rule, 16 C.F.R. § 312.5(a)(1)).

44.    The law defines "personal information" broadly to include not only names and contact details but also persistent identifiers such as cookies, IP addresses, device IDs, and other tracking technologies used for behavioral advertising.

45.    The FTC, which enforces COPPA, has made clear that COPPA

applies not only to websites and apps that are directed to children, but also to general-audience platforms—like YouTube—when they have actual knowledge that child-directed content is being hosted.

46.     COPPA reflects a strong policy interest in shielding children from invasive data practices and commercial exploitation, and violations of the statute can result in significant civil penalties and injunctive relief.

### E.     COPPA Enforcement Against YouTube

47.     In 2019, the FTC brought an enforcement action against YouTube and its parent company, Google LLC, for violating COPPA. The FTC alleged that YouTube knowingly collected personal information about children through personal identifiers that are used to track users across the internet, without first notifying parents and getting their consent.

48.     The complaint specifically cited YouTube's and its content creators' practice of hosting and profiting from child-directed content and channels.

49.     As part of the FTC settlement, YouTube agreed to pay a then-record $170 million fine and implement systemic changes to its platform, including requiring content creators, such as Disney, to designate whether the videos being uploaded are "made for kids."

50.     The FTC action made clear that both platform operators and content creators share responsibility under COPPA for protecting children's privacy,

13

especially when monetizing child- directed content through advertising and data collection practices.

51.      In November 2019, YouTube directed Disney and other content creators that, moving forward, they would be required to inform YouTube whether their content is "made for kids" in order to comply with COPPA.

52.      As part of this requirement, Disney and other content creators can set their entire channel as "made for kids" if much of the content on the channel is targeted towards children using one of the settings for the channel:

14

53.     A related setting on the same tab within YouTube's channel settings gives content creators like Disney the power to turn off interest-based (*i.e.*, behavioral) advertising, but emphasizes that doing so "may significantly reduce your channel's revenue":

| Basic info | **Advanced settings** | Feature eligibility |

**Advertisements** ⑦

☐ Disable interest-based ads

If you select this option, personalized ads will not be shown on videos on your channel, such as ads based on a viewer's interests or remarketing ads. This may significantly reduce your channel's revenue. In addition, earned action reports and remarketing lists will stop working for your channel.

54.     Since 2019, YouTube has relied on content creators' own management of their settings, and designation of their channels and videos as "made for kids" or not, to determine what functionality and advertising YouTube should make available on videos.

55.     When a video (or entire channel) is set as "made for kids," certain functionality on that video is disabled by YouTube, including targeted or personalized advertising and the collection of viewing history and personal information that facilitates targeted and personalized advertising.

56.     Designating a video or channel as "made for kids" also disables the following features:

    a.  Live chat;
    b.  Video comments;

c.  Playback in the Miniplayer, which allows a video to continue to play on a small screen as a user browses YouTube;
d.  Autoplay from the YouTube home screen;
e.  Cards or end screens;
f.  Video watermarks;
g.  The ability to become a channel "member";
h.  A button to solicit donations for a cause;
i.  Merchandise and ticketing;
j.  Notifications;
k.  Super Chat or Super Stickers; and
l.  "Save to playlist" and "Save to Watch Later" features.

57.  In addition to these features being disabled, the designation of a video as "made for kids" also affects the overall function of autoplay on YouTube, when a new video will automatically play when a user has finished watching a video. When a video is marked as "made for kids" it will exclusively autoplay to other videos marked as "made for kids," and will not play videos designated as "not made for kids."

58.  If a content creator like Disney designates an entire channel as "made for kids," these features are disabled on every video for that channel by default, and the content creator would have to manually change this setting for any video that the content creator wanted to designate as not made for kids. Additional channel-related features are also disabled, including notifications, posts, and comments related to the channel's page.

59.  Conversely, if a content creator set an audience at the channel level as "not made for kids," the content creator would have to manually change this

setting for any video that the content creator wanted to designate as "made for kids" to comply with COPPA.

60.     The features disabled when a content creator designates a video or channel as "made for kids" are disabled, in part, to prevent the collection of personal information from children that would require operators to provide notice and obtain verifiable parental consent under COPPA and the COPPA Rule.

61.     When a content creator like Disney does not designate a video as "made for kids," these features will activate, including collection of personal information and viewing history data to enable targeted behavioral advertising directed towards children.

62.     In November 2019, YouTube explicitly warned content creators, including Disney, that failure to set their content accurately may lead to legal liability and compliance issues with the FTC or other authorities.

**F.     Disney's Failure to Comply with COPPA**

63.     Disney had the ability, and a mandatory duty, to designate its videos as "made for kids" under YouTube's compliance framework following the FTC's 2019 COPPA enforcement action.

64.     Disney also had the ability to turn off interest-based (*i.e.*, behavioral) advertising for its videos.

65.     Nevertheless, Disney failed to properly designate its videos and

children-directed content on YouTube as "made for kids," and/or failed to turn off interest-based advertising on content directed at children.

66.    Disney operates and uploads videos to channels that it has designated as "made for kids" as well as channels it has designated as "not made for kids." Upon information and belief, per corporate policy, Disney sets the audience designation as either "made for kids" or "not made for kids" at the channel level and does *not* change the designation for individual videos uploaded to each channel under Disney's content umbrella.

67.    Under Disney's channel-level policy, Disney allows the video to remain by default designated as "not made for kids" if that video is uploaded to a channel Disney has designated as "not made for kids," even if the video is obviously directed at children.

68.    Disney knowingly fails to make these designations properly for its channels and videos, despite producing and uploading vast amounts of content that is unmistakably directed at children under the age of 13.

69.    Disney's mislabeling of its videos and channels affirmatively allows YouTube to collect personal information from child users of YouTube, generate additional revenue from advertising directed at these child users, and provide Disney with demographic insights and analytics that assist Disney with its targeted advertising; all of this violates COPPA.

18

70.     Child-directed videos that Disney designated as "not made for kids" include videos available on, among other channels:

   a. the Pixar channel;
   b. the Disney Animation Studios channel;
   c. the Disney Movies channel;
   d. the Disney on Ice channel;
   e. the Disney on Broadway channel;
   f. the Disney Channel channel, which posts video content for Disney's television channel targeted at children ages 6-14;[2]
   g. the Disney Plus channel, which posts video content from Disney's streaming service;
   h. the Walt Disney Studios channel, which posts video content from across Disney's various film studios;
   i. the Oh My Disney channel, which formerly posted video content for Disney's official blog; and
   j. the Disney D23 channel, which formerly posted video content related to the official Disney fan club.

71.     Many or all of the videos on these channels are unquestionably directed toward children under the age of 13 based on their visual content, subject matter, music, language and other characteristics.

72.     These videos often include bright, colorful visuals, simple language, sing-along songs, nursery rhymes, basic educational themes, and storylines designed to appeal to preschoolers and early elementary-age viewers. The videos also frequently feature animated characters like Mickey Mouse, Elsa, Moana, Lightning McQueen, and other iconic figures from Disney's catalog that are specifically

---

[2]   Press Release and Fact Sheet, Disney Channels Worldwide (Jan. 2019), https://www.detpress.com/storage/uploads/6C/D1/6CD1F20D-309F-A786-C52E-C515FC8B65A7/press-release-9-165053.pdf.

marketed to and beloved by young children.

73.     These elements, combined with Disney's iconic branding as a provider of family and children's entertainment, makes it objectively clear that these videos fall squarely within the definition of "child-directed" under COPPA and FTC guidance.

74.     Disney's failure was not accidental or technical; it was a deliberate business decision that prioritized deliberate collaboration that prioritized advertising revenue over children's privacy rights.

75.     In June 2020, YouTube notified Disney of over 300 videos that were not appropriately marked "made for kids," despite child-directed subject matters featuring characters from The Incredibles, Coco, Toy Story, Tangled, and Frozen. Although Disney was notified that YouTube was reclassifying these videos as "made for kids," it refused to revise its policy of designating videos based on the channel-level default.

76.     On September 2, 2025, the FTC brought an enforcement action against Disney for violating COPPA by failing to properly mark certain YouTube videos as "made for kids." According to the FTC, this mislabeling, including content from obvious child-directed videos, allowed the collection of personal data from children under 13 years old without verifiable parental notification or consent and enabled targeted advertising through YouTube that is prohibited under COPPA.

77.     FTC chairman Andrew Ferguson condemned Disney's handling of child-directed content on YouTube, stating that the enforcement action "penalizes Disney's abuse of parents' trust[.]"

**G.     Disney Collected Sensitive, Valuable Information from Children Without Their Consent.**

78.     While the FTC brought an enforcement action against Disney for its violations of COPPA, this action does not provide compensation or redress for the children and families directly harmed by Disney's misconduct. Minor Plaintiffs' and Class Members' personal information was unlawfully collected and monetized without parental consent. These children suffered concrete and particularized injuries, including the loss of statutory privacy protections, exposure to surveillance and targeted advertisement, and the exploitation of their online behavior in the name of corporate profit.[3]

79.     Disney's failure to accurately designate child-directed videos as "made for kids" results in YouTube collecting personal information and placing targeted advertisements on child- directed videos on Disney's behalf. In addition to targeted advertising, when videos are not properly marked as "made for kids," other features that YouTube routinely disables on "made for kids" videos are available,

---

[3] Press Release, Fed. Trade Comm'n, *Disney to Pay $10 Million to Settle FTC Allegations the Company Enabled the Unlawful Collection of Children's Personal Data* (Sep. 2, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/disney-pay-10-million-settle-ftc-allegations-company-enabled-unlawful-collection-childrens-personal.

including the ability to save videos and the ability to comment on videos. YouTube disables features on "made for kids" videos and channels in part because they would rely on the collection of user data to work properly.[4]

80.    Minor Plaintiffs and Class Members were harmed when Disney enabled YouTube to collect their personal information. Reasonable guardians, including the guardian of the Minor Plaintiffs, would not have allowed their children to access Disney channels on YouTube had they been aware of the extent to which children's privacy would be violated as a result.[5]

81.    In today's data-driven attention economy, children's personal information is exceptionally valuable to advertisers. From a young age, children generate "digital footprints," informed by their browsing behavior, viewing habits, device and application usage, preferences, and engagement patterns. Unique identifiers can be used to track a child's behavior across platforms, and data brokers are able to develop detailed profiles and predictive models that enable microtargeting and influence over future customer behavior. Companies use this data to fuel their advertising revenue and shape long-term buying habits and brand loyalty, making children a particularly lucrative and vulnerable target.[6]

---

[4] *Id.*
[5] *Id.*
[6] Pulkit Gupta, *The Hidden World of Children's Data: Protecting Their Digital Footprints*, Cloaked (Sep. 7, 2024), https://www.cloaked.com/post/the-hidden-world-of-childrens-data-protecting-their-digital-footprints.

22

82.     Children do not have the same capacity as adults to understand the implications of data collection or targeted marketing, nor can they meaningfully consent to its collection. Indeed, recognizing the sensitivity and value of this data is the reason Congress enacted COPPA.

83.     When companies like Disney disregard those protections, they profit from the unlawful exploitation of children's identities and attention to the detriment of both privacy and public trust.

84.     Indeed, there is a market for data like the data collected on the YouTube platform when the "not for kids" notation is selected by Disney. Minor Plaintiffs and Class Members suffered pecuniary losses when their data was collected and shared with third parties in part because of the value of the data itself. Without the freedom to control what becomes of their data, children are unable to maintain the value of their personal data—a consequence they will likely carry the rest of their lives.

85.     The value of children's personal information is clear. For example, when cybercriminals steal such information, like the information Disney enabled to be collected through YouTube, the criminals face huge fines and lengthy prison sentences. Organizations across every sector use and monetize consumer data to increase profits.

86.     And the value of such information as a commodity is measurable. In

monetary terms, academic research from institutions such as MIT and Carnegie Mellon has estimated that individual user data can be worth $240 or more per year to advertisers, with children's data commanding a premium due to its potential for early brand capture and influence.[7] Google has recognized the value of user data and even instituted a program that would pay users up to $540 a year to allow Google to track their online activities.[8]

87.     Courts, too, have recognized that personal information is extremely valuable in our digital economy.  *See, e.g., In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

88.     Several companies have products through which they pay consumers for a license to collect or track their data, including Nielsen, HoneyGain, and Caden. Facebook also has paid users to gather data on usage habits. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from

---

[7] Acquisti, Allesandro et al., The Economics of Privacy, 54 J. Econ. Lit. 442, 444 (2016); *see also* Egelman, Serge et al., What's the Value of Your Data?, Carnegie Mellon CyLab (2020).
[8] *See* Google Device Usage Study, https://deviceusagestudy.google/signup/invitecode.

consumers between the ages 13 and 35.

89.     Through its conduct and practices, Disney has unlawfully exploited the personal information of Minor Plaintiffs and Class Members without their permission and without compensating them for the use of their assets.

90.     Minor Plaintiffs and Class Members, through their guardians, had a reasonable expectation of privacy while engaging with Disney's YouTube channels because of societal norms as well as the implementation of laws such as COPPA, which were designed to protect children's privacy.

91.     Users young and old highly value their privacy when online—privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data. For example, one study found that 92% percent of Americans felt that internet companies "should be required to get their permission before selling or sharing their data."[9]

**H.     Disney Violated Minor Plaintiffs' Rights.**

92.     Minor Plaintiffs are citizens of Florida and were under the age of 13 years old between 2019 and September 2, 2025.

---

[9] Katie McInnis, *The Evolution of Consumer Attitudes Toward Online Tracking, 1995-2019*, Consumer Reports Digital Lab (May 2020), at 36, https://innovation.consumerreports.org/The-Evolution-of-Consumer-Attitudes-Toward-Online-Tracking_5.20.20_FINAL.pdf.

93.     Minor Plaintiffs accessed Disney's channels via the YouTube platform and viewed child-directed content at least twice weekly between 2019 and September 2, 2025.

94.     Upon information and belief, Minor Plaintiffs viewed videos that were clearly directed at children, but that Disney failed to designate as "made for kids." Minor Plaintiffs watched these videos across several Disney channels on YouTube. As a result, Minor Plaintiffs' data was collected and exploited for targeted behavioral advertising.

95.     Minor Plaintiffs' guardian was never notified that Disney had enabled the collection of his children's personal information and viewing history for the purpose of targeted behavioral advertising.

96.     Minor Plaintiffs' guardian never provided consent of any kind for his children's information to be collected and used for targeted behavioral advertising on the YouTube platform.

97.     Minor Plaintiffs' guardian places significant value in his children's privacy and would not have consented to the collection of his children's data on Disney channels.

98.     Minor Plaintiffs' guardian would not have permitted his children to access YouTube and Disney's content on YouTube had he known that Disney was not abiding with internet laws designed to protect his children and their personal

information.

## V. <u>CLASS ACTION ALLEGATIONS</u>

99.      Plaintiff, on behalf of his minor children, J.D. and A.D., brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class and subclass defined as:

<u>Nationwide Class</u>

> All natural persons in the United States who, at any time between November 1, 2019, and September 2, 2025, were under 13 years old and watched child-directed content that was uploaded by Disney on YouTube and not marked as "made for kids." (the "Class").

<u>Florida Subclass</u>

> All Florida residents who, at any time between November 1, 2019, and September 2, 2025, were under 13 years old and watched child-directed content that was uploaded by Disney on YouTube and not marked as "made for kids." (the "Florida Subclass").

100.      Collectively, the Class and Florida Subclass are referred to as the "Classes" or "Class Members."

101.      Excluded from the Classes are Defendants, their subsidiaries and affiliates, their officers, directors, and members of their officers' and directors' immediate families, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

102.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes prior to moving for class certification.

103.     **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Classes and the identities of the individual members thereof are ascertainable through Defendants' records, including, but not limited to, the YouTube analytics data collected by Defendants for YouTube uploads on Disney-affiliated channels. Upon information and belief, the Class, at minimum, comprises millions of children and former children.

104.     **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class Members. Such common questions include, but are not limited to:

a. Whether Disney gathered the personal identifying information of Class Members.
b. Whether Disney gathering the YouTube viewing history and related information for Class Members.
c. Whether Disney obtained verifiable parental consent before collecting the personal identifying information and/or viewing history of Class Members.
d. Whether Disney violated Minor Plaintiffs' and Class Members right to privacy.
e. Whether Plaintiff and Class members are entitled to relief, including restitution and injunctive relief; and
f. Whether Plaintiff and Class members are entitled to damages or other monetary relief, and if so, in what amount.

105. **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same illegal conduct by Defendants as alleged herein, which caused Plaintiff and Class Members to suffer the same or similar injuries and/or damages. Plaintiff's claims are thereby representative of and typical of the claims of all other Class Members.

106. **Adequacy of Representation.** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the other Class Members that Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Classes will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

107. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class

treatment will create economies of time, effort, and expense and promote uniform decision- making.

108. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive and declaratory relief appropriate to the Classes as a whole.

109. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the Classes. If Defendants breached their duties and released Plaintiff's and Class Members' PII, then Plaintiff and each Class Member suffered damages by that conduct.

110. **Ascertainability:** Members of the Classes are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendants' books and records.

## VI.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Invasion of Privacy – Intrusion Upon Seclusion (On Behalf of Plaintiffs and the Class)

111.  Plaintiffs restate and reallege the factual allegations contained in paragraphs 1 through 110 as if fully set forth herein.

112.  Plaintiffs and Class members have an objective, reasonable expectation of privacy in the online activities of minors and their online communications, including minors' location, personal information, viewing history and browsing activities on YouTube.

113.  Plaintiffs and Class members did not consent to, authorize, or know about Disney's intrusion at the time it occurred. Plaintiffs and Class members never agreed that Disney could collect and disclose data regarding their identity, location, viewing history, and other online activity while using internet-connected devices to YouTube and advertisers.

114.  Plaintiffs and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

115.  Disney intentionally intrudes on Plaintiffs' and Class members'

private life, seclusion, or solitude, without consent. The content on Disney's YouTube channels was clearly and unmistakably directed toward children, and Disney was well-aware of the demographic that made up the vast majority of its audience. Yet, Disney failed to designate this content as "made for kids,"thereby enabling the platform and its ad partners to secretly track, profile, and target young viewers for behavioral advertising.

116.    At no time did Plaintiffs nor their guardian ever provide Disney with any form of consent, either written or otherwise, to intrude upon the privacy of their communications and online activity, even though Disney was legally obligated to notify parents' of their data collection and obtain parents' consent to such an intrusive collection under COPPA.

117.    Disney's conduct is highly objectionable and offensive to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy, in particular the right to privacy for minors under the common law and COPPA. The offensiveness of Disney's conduct is demonstrated by consumer surveys, academic studies detailing the harms of tracking children online, centuries of common law, scholarly literature on consumers' reasonable expectations, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, and the fines sought by the FTC predicated on

Disney's conduct.

118. Disney's conduct has needlessly harmed Plaintiffs and the Class by capturing intimately personal facts and data in the form of their online communications. This disclosure and loss of privacy and confidentiality have caused Plaintiffs and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

119. Further, Disney has improperly profited from its invasion of Plaintiffs' and Class Members' privacy in its use of their data for its lucrative economic value, in particular for behavioral and targeted advertising.

120. As a direct and proximate result of Disney's conduct, Plaintiffs and Class Members were actually and concretely injured.

121. Plaintiffs and Class Members are therefore entitled to damages, including but not limited to compensatory, punitive, and/or nominal damages, in an amount to be proven at trial, and disgorgement of profits realized by Disney as a result of their intrusion upon Plaintiffs' seclusion.

122. Disney's conduct is ongoing, and it continues to unlawfully intrude upon, intercept, and disclose the communications of Plaintiffs and Class Members without their consent. Plaintiffs and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

**SECOND CAUSE OF ACTION**
**Trespass to Chattels**
**(On Behalf of Plaintiffs and the Class)**

123.    Plaintiffs restate and reallege the factual allegations contained in paragraphs 1 through 110 as if fully set forth herein.

124.    Plaintiffs and Class Members have a property interest in their personal information, which is an asset with value that Plaintiffs and Class Members possess.

125.    As a result of Disney's unlawful conduct, Disney unlawfully took possession of and commercially exploited Plaintiffs and Class Members, including by using their personal information for purposes of targeted behavioral advertising, without their consent or permission, and without compensating them for the use of their assets.

126.    By intentionally choosing to not designate clearly child-directed content as "made for kids" on YouTube, Disney enabled and benefited from the surreptitious placement of tracking tools on children's devices through third-party advertising systems. This conduct was done without notice, authorization, or valid parental consent, and was specifically intended to harvest behavioral data from children for advertising and profit.

127.    As a result of the conduct and practices alleged herein, including the unauthorized digital intrusion, Disney's conduct caused harm, in that it damaged,

diminished, impaired, interfered with, and/or destroyed the value of the personal information in which Plaintiffs and Class Members have a possessory interest.

128.     Plaintiffs and Class members are therefore entitled to damages, including but not limited to compensatory, punitive, and/or nominal damages, in an amount to be proven at trial, and disgorgement of profits realized by Disney as a result of their intrusion upon Plaintiffs' seclusion.

## THIRD CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiffs and the Class)

129.     Plaintiffs restate and reallege the factual allegations contained in paragraphs 1 through 110 as if fully set forth herein.

130.     Disney owed a duty of care to children who viewed its content to safeguard their privacy and personal information.

131.     This duty of care to children was higher than the duty owed to an ordinary consumer because of a child's lack of capacity to appreciate and mitigate risks.

132.     Disney also owed independent duties under state and federal laws, including COPPA, to take reasonable steps to protect the online privacy of children.

133.     Disney breached these duties by negligently, recklessly, and/or knowingly failing to appropriately mark child-directed videos as "made for kids" and therefore failing to prevent the collection and use of children's personal data for targeted advertising purposes.

134.     Disney's breach is particularly egregious because Disney knew or should have known that its content was viewed primarily by children under the age of 13, and that failure to properly designate such content as "made for kids" would result in the collection of young viewers' personal information, including persistent identifiers such as cookies and IP addresses, without verifiable parental consent.

135.     Disney's actions also violate its duties under COPPA.

136.     Disney's violation of COPPA is particularly egregious as YouTube notified Disney of its obligations to comply with COPPA as early as 2019, and explicitly informed Disney that it was failing to comply with COPPA as early as 2020.

137.     Minor Plaintiffs and Class Members are "children" within the class of persons Section 5 of the FTC Act was intended to protect.

138.     Moreover, the harm that has occurred is the type of harm that COPPA was intended to guard against. Indeed, the FTC has already pursued an enforcement action against Disney to punish Disney for the same harm suffered by Plaintiffs and Class Members.

139.     Disney's violation of COPPA therefore also constitutes negligence *per se*.

140.     As a direct and proximate result of Disney's negligence, Plaintiffs and Class Members have suffered injuries, including the collection, exposure, and

exploitation of their personal information, including their viewing history and preferences, as well as additional injuries identified above.

141. Plaintiffs and Class Members are therefore entitled to damages, including but not limited to compensatory, punitive, and/or nominal damages, in an amount to be proven at trial, and disgorgement of profits realized by Disney as a result of their unlawful conduct.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

142. Plaintiffs restate and reallege the factual allegations contained in paragraphs 1 through 110 as if fully set forth herein.

143. Disney received a benefit from their collection and use of Plaintiffs' and Class Members' data and personal information, including the ability to deploy targeted advertising to minor children, such as Plaintiffs and Class Members, in violation of state and federal law.

144. Disney's collection and use of Plaintiffs' and Class Members' PII yielded significant monetary benefit to Disney, as Disney directly profited from its arrangement with YouTube to earn advertising revenue and through enhanced audience insights used to further their commercial interests.

145. Disney enriched themselves through advertising targeted to Plaintiffs and Class Members, among various means. Disney's enrichment came at

the direct expense of Plaintiffs and Class Members, whose privacy was compromised and whose personal data was wrongfully used to generate corporate profit.

146.    As set forth above, Disney's ability to engage in targeted and behavioral advertising allowed it to reap significantly higher advertising revenue than if it was only able to engage in contextual advertising on its videos; however, if Disney had properly marked its videos as "made for kids," it could not have been able to engage in behavioral advertising.

147.    Disney's profiting from its unlawful conduct is therefore unjust and unconscionable to Plaintiffs and Class Members, as Disney was only able to profit from Plaintiffs and Class Members because their privacy was violated and their Personal Information collected in violation of state and federal law in a way that would be unconscionable and highly offensive to a reasonable person.

148.    Plaintiffs and Class Members are without an adequate remedy at law for Disney's unjust and unconscionable conduct.

149.    As a direct and proximate result of Disney's conduct, Plaintiffs and Class Members have suffered injuries, including those identified above.

150.    Plaintiffs and Class Members are entitled to restitution and/or damages from Disney and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Disney from their wrongful conduct.

## FIFTH CAUSE OF ACTION
### Violation of The Florida Deceptive and Unfair Trade Practices Act
### §§Fla. Stat. 501.201 *et seq.*
### (On Behalf of Plaintiffs and the Florida Subclass)

151.    Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

152.    Plaintiffs bring this Count individually and on behalf of the Florida Subclass.

153.    Plaintiffs and members of the Florida Subclass are residents of Florida and watched child-directed content that was uploaded by Disney on YouTube and not marked as "made for kids while under the age of 13.

154.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce. § 501.204, Fla. Stat. 130. Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat.

155.    Defendants' actions are deceptive and in clear violation of FDUPTA, entitling Plaintiffs and the Florida Subclass to damages and relief under Fla. Stat. §§ 501.201- 213.

156.     Defendants each engaged in "trade" or "commerce" in Florida in that Defendants each engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Florida.

157.     Defendants each engaged in consumer-oriented acts through the offer, promotion, and/or distribution of Disney videos on YouTube, which significantly impacted the public because Disney videos are viewed on YouTube nationwide, including in Florida, and there are millions of users, including Plaintiffs and members of the Florida Subclass.

158.     As outlined herein, Defendants at all times had actual knowledge of their own noncompliance with COPPA and other applicable privacy-related laws. Further, Defendants at all times had actual knowledge of their collection of the Personal Information of Plaintiffs and Florida Subclass members and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

159.     Defendants have engaged, and continue to engage, in conduct that is likely to deceive members of the public. This conduct includes failing to disclose that Defendants were collecting and disseminating the private information of minors without parental notice or consent.

160.     This information is important to consumers, including Plaintiffs, because disclosure of PII creates a substantial risk of future identity theft, fraud, or

other forms of exploitation.

161. Disney was aware at all times that a significant portion of its users were under the age of 13 and nonetheless collected the Personal Information of those children for the purpose of serving those children behavioral advertising for substantial commercial gain.

162. Defendants purposefully sought to undermine their compliance through, among other practices, implementation of a woefully inadequate age-gating system, and monitoring policies and procedures designed to allow them to continue knowingly collecting and using the Personal Information of children.

163. Defendants have engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

164. Defendants systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, by:

  • Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

  • Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required

content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

• Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

• Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

165.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c). These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Fla. Stat. Ann. § 501.201, et seq.[10]

166.    Accordingly, Defendants engaged in unfair and unlawful trade acts or practices in violation of Fla. Stat. Ann. § 501.204, et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

167.    Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater

---

[10] See 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or Personal Information from and about children on the internet.").

countervailing benefits to consumers or competition.

168. Plaintiffs and members of the Florida Subclass could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

169. Consumers like Plaintiffs and the Florida Subclass did not know that they were giving their PII to Defendants or that Defendants were failing to safeguard such PII.

170. Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Fla. Stat. Ann. § 501.204, et seq.

171. Plaintiffs and members of the Florida Subclass were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to Plaintiffs and members of the Florida Subclass.

172. As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Fla. Stat. Ann. § 501.204, et seq., Plaintiffs and members of the Florida Subclass have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and nonmonetary damages, as described herein, including, *inter alia*, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability

to control the use of their Personal Information, which allowed Defendants to profit at the expense of Plaintiffs and members of the Florida Subclass. Such an injury is not outweighed by any countervailing benefits to consumers or to competition.

173. Because Defendants' misconduct is ongoing and continuing, prospective injunctive relief is necessary. Absent injunctive relief, Defendants may continue to collect consumers' PII while failing to adequately safeguard such PII.

174. As outlined herein, there is tangible value in Plaintiffs' and members of the Florida Subclass's Personal Information. Plaintiffs and members of the Florida Subclass have lost the opportunity to receive value in exchange for their Personal Information.

175. Defendants' monetization of Plaintiffs' and members of the Florida Subclass' Personal Information demonstrates that there is a market for their Personal Information.

176. Plaintiffs' and members of the Florida Subclass' Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

177. Florida Statutes, Section 501.204, makes unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

178. Florida Statutes, Section 501.211, creates a private right of action for individuals who are aggrieved by an unfair and/or deceptive trade practice by

another person.

179.    Florida Statutes, Section 501.2105, provides that the prevailing party in litigation arising from a cause of action pursuant to Chapter 501 shall be entitled to recover attorney's fees within the limitations set forth therein from the non-prevailing party.

180.    Florida Statutes, Section 501.213, provides that any remedies available under Chapter 501 are in addition to any other remedies otherwise available for the same conduct under state or local law.

181.    Defendants' retention of Plaintiffs' and members of the Florida Subclass's Personal Information presents a continuing risk to them as well as the general public. Plaintiffs and members of the Florida Subclass seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Fla. Stat. Ann. § 501.204, et seq. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by them and any other third parties, and other appropriate injunctive and/or declaratory relief.

182.    In accordance with FDUTPA, Plaintiffs and the Florida Subclass

seek an order enjoining Defendants from continuing to conduct business through fraudulent or unlawful acts and practices. Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

183.    On behalf of Plaintiffs and the Florida Subclass, Plaintiffs also seek an order entitling them and the Florida Subclass to recover all monies which were acquired through Defendants' acts of fraudulent, unfair, or unlawful competition.

### SIXTH CAUSE OF ACTION
**Violation of the Federal Wiretap Act 18 U.S.C. § 2510 *et seq.***
**(On Behalf of Plaintiffs and the Class)**

184.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

185.    Codified under 18 U.S.C. § 2510 *et seq.*, the Federal Wiretap Act prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

186.    The Wiretap Act was amended in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions, and to address Congress' concerns that technological advancements in computers and other methods of communication were rendering the Wiretap Act out-of-date.[11]

187.    The Wiretap Act now confers a civil private right of action to "any

---

[11] Senate Rep. No. 99-541, at 2 (1986).

person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

188.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

189.    The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

190.    The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

191.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce. " 18 U.S.C. § 2510(12).

192.    Each Defendant is a person for the purposes of the Wiretap Act

193.    YouTube's user tracking tools that Disney allows YouTube to deploy on videos not marked as "made for kids" constitute a "device or apparatus which can

be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

194.     The confidential communications Plaintiffs and members of the Class had with Disney's channels and videos, in the form of their clicks, likes, comments, subscription actions, the videos they chose to watch, other browsing information, and PII, that were intercepted by YouTube and its advertisers were "electronic communications" under 18 U.S.C. § 2510(12).

195.     Plaintiffs and members of the Class had a reasonable expectation of privacy in their electronic communications in the form of their clicks, likes, comments, subscription actions, viewing history and their PII. This expectation is reasonable in light of Congress' determination that children have a privacy interest in their online activities and personal information online, as codified in COPPA.

196.     Plaintiffs and members of the Class reasonably expected that YouTube and third-party advertisers were not intercepting, recording, or disclosing their electronic communications to build user profiles for targeted advertising.

197.     At all times relevant to this Complaint, the Disney's conduct was knowing, willful, and intentional, as Disney is a sophisticated party with full knowledge regarding the functionality of YouTube's data collection and tracking tools, and was explicitly informed by YouTube that Disney was obligated to mark children-directed videos as "made for kids" in order to prevent the interception and sharing of child users' private communications with YouTube and third party

48

advertisers in real time.

198.     At no time did Plaintiffs nor their guardian ever provide Disney with any form of consent, either written or otherwise, to facilitate YouTube's interception of their communications.

199.     Moreover, while the ECPA allows a single party to consent to the interception of an electronic communication, single party consent is only acceptable where the communication is not "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. §2511(2)(d). Disney's conduct falls within this crime-tort exception, as the FTC has already found that Disney's interception of Plaintiffs' communications violated COPPA.

200.     As a result of Disney's wrongful conduct, Plaintiffs and the Class have had their statutorily defined right to privacy violated through the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. Plaintiffs seek an injunction to prohibit Disney's continued violations of the Wiretap Act, as well as the maximum actual, statutory, and punitive damages available under the Wiretap Act.

## VII.   PRAYER FOR RELIEF

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, prays for relief as follows:

49

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

B. For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

C. For damages in an amount to be determined by the trier of fact;

D. For an order of restitution and all other forms of equitable monetary relief;

E. Declaratory and injunctive relief as described herein;

F. Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

G. Awarding pre- and post-judgment interest on any amounts awarded; and

H. Awarding such other and further relief as may be just and proper.

## VIII.  JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: September 29, 2025

/s/ *Laurence Rosen*
**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.,
Fla. Bar No. 0182877
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

50